PRESENT:  All the Justices

JAMES G. DAVIS CONSTRUCTION CORPORATION

                                            OPINION BY
v.  Record No. 190345              JUSTICE STEPHEN R. McCULLOUGH
                                            May 14, 2020
FTJ, INC., F/K/A CIESCO, INC.


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

Relying on the doctrine of unjust enrichment, the trial court held that a general contractor,

James G. Davis Construction Corporation ("Davis"), was liable for construction materials

provided by a supplier to one of Davis's subcontractors.  Davis challenges this judgment on a

number of grounds.  For the reasons noted below, we affirm the trial court's judgment.

BACKGROUND

Davis served as the general contractor for a residential condominium project in Arlington

County.  On February 19, 2016, Davis contracted with H&2 Drywall Contractors to complete the

drywall and metal framing for this project.  H&2 was required to provide all labor, materials,

supervision, and equipment to complete those aspects of the construction project.  The revised

contract between Davis and H&2 called for H&2 to be paid a total of $1,269,396, which was to

be paid in installments.  The contract also called for 10 percent retainage, to be withheld until

final payment was due.

H&2 agreed to purchase materials for the project from Ciesco, now known as FTJ, Inc.

H&2 completed a Credit Application and Agreement, in which it agreed to pay Ciesco for

materials delivered to H&2.  Renan Buendia, the principal of H&2, also provided a personal

guarantee to pay Ciesco any amounts H&2 owed to Ciesco for building materials.

To ensure the smooth operation of the project, Davis and H&2 entered into a joint check agreement. That agreement provided as follows:

## JOINT CHECK AGREEMENT

THIS JOINT CHECK AGREEMENT ("Agreement") is made this 29 day of April, 2016 by and among (1) JAMES G. DAVIS CONSTRUCTION CORPORATION, whose address is 12530 Parklawn Drive, Rockville, Maryland 20852 ("DAVIS"), (2) H&2 Drywall Contractors ("Subcontractor") whose address is 6702 Braddock Rd. Annandale VA 22003 and (3) ("Supplier") Ciesco Inc. whose address is Corporate Office
109 Millers Ln
Harrisburg PA 17110

The parties to this agreement hereby agree as follows:

1. Any and all material checks issued by DAVIS to Subcontractor for invoices submitted by Supplier to Subcontractor on sales of materials in connection with the construction project known as Lot 3 Gas line ("Project") shall be made payable to Supplier and Subcontractor, provided Subcontractor and Supplier agree upon the amount actually owed by Subcontractor to Supplier for such invoices.
2. All such checks issued by DAVIS to Subcontractor shall be immediately endorsed by Subcontractor, then promptly delivered by Subcontractor to Supplier at the above address (or such other address as Supplier may designate in writing).
3. DAVIS will only make payments to Subcontractor and Supplier by joint check to the extent that DAVIS actually owes money to Subcontractor on the Project.
4. The sole purpose of this Agreement is to assist Subcontractor in making payment to Supplier of invoices on sales of all materials furnished by Supplier to Subcontractor for use in connection with the Project. This Agreement does not constitute an assignment of fund. Nothing contained in this Agreement is intended by the parties to create any contractual relationship or equitable obligation between DAVIS and Supplier; this Agreement is solely for the convenience of the parties. This Agreement may be cancelled at any time by DAVIS upon written notice to Subcontractor and Supplier.

JAMES G. DAVIS CONSTRUCTION CORP.          SUBCONTRACTOR  H&2
                                                                                     drywall contractor


By  Michelle Christen                                         By  Renan Buendia

2

Michelle Christen - VP Accounting       Renan Buendia PM
                  Financial Reporting

                                                 SUPPLIER
                                                 By   Jeffrey G. Depew CFO
                                                 Jeffrey G. Depew II

The agreement thus specifies a method for how Ciesco would be paid for the materials it shipped to the job. Ciesco would send its invoices to Davis and H&2. Davis would pay via a joint check made payable to both H&2 and Ciesco and deliver the check to H&2. H&2 would then endorse the check and turn it over to Ciesco to apply against the invoices for the project. The joint check agreement specifies that "DAVIS will only make payments [to H&2] and [Ciesco] by joint check to the extent that DAVIS actually owes money to [H&2] on the Project."[1]

Joint checking agreements are common in the construction industry. A joint checking agreement facilitates payment to a supplier, by providing a greater assurance to the supplier that it will be paid. With a joint check, the subcontractor cannot abscond with money owed to the supplier. From Ciesco's perspective, the joint check agreement meant that there was no credit limit on the amount of materials it would ship to H&2 at one time. The agreement made Ciesco more confident that it would be paid and alleviated any concerns it might have about shipping a larger increment of materials.

Ciesco began shipping materials in July 2016. Payment was due within 60 days of the date of the invoice. When Ciesco experienced repeated delays in the payment of its invoices, Jolene Finley, an accountant with Ciesco, reached out to Davis at repeated intervals: November 11, 2016, December 13, 2016, and January 10, 2017. Ciesco's policy was not to ship additional

---

[1] The joint check agreement does not provide that it is subject to the terms of Davis's subcontract with H&2.

3

materials on accounts that are past due. Each time Ciesco inquired about the past due invoices, Davis responded that a check had been or would be written. Initially, the parties contemplated that the check would be written pursuant to the joint check agreement and that is how Davis paid, writing joint checks to H&2 and Ciesco. Davis sent two "release of liens" forms to Ciesco for invoices that had been paid. Davis paid the invoices for materials Ciesco provided through December of 2016. Benjamin Mahoney, who managed the project for Davis, acknowledged that a supplier who is not paid might cut off supplies, and that there is "always a concern" about non-payment generating delays. Mahoney explained that Davis's involvement with Ciesco's invoices is "not a typical scenario for us to be in." He testified that, ordinarily, the subcontractor is hired "to manage that process, to manage the orders, [and] to manage the invoices." Davis' assurances to Ciesco in January 2017 resulted in Ciesco continuing to ship materials to H&2 rather than withholding materials because the account was past due.

As work on the project progressed, Davis noticed that H&2 was in difficulty. In early 2017, Davis learned that H&2 had "payroll payment problems" and was not paying its employees. As a predictable result of not paying its employees, H&2 was having trouble supplying enough personnel to complete the project. By March 22, 2019, Davis came to the conclusion that H&2 would not be able to pay its suppliers. For its part, Ciesco was not aware of any issues H&2 was having. However, while Davis was communicating with Ciesco about Ciesco's unpaid invoices, Davis was concerned about Ciesco cutting off supplies to H&2 based on, at least in part, H&2's financial condition.

Ciesco made deliveries of materials from January 10 through March 22. Neither H&2 nor Davis paid for those materials. Ciesco did not deliver any additional materials after March 2017.

4

On March 21, 2017, Davis issued a "notice to cure" to H&2, detailing the issues Davis was having with H&2. The second paragraph of the notice highlighted the ongoing nature of the problems with H&2. It stated "As previously notified, H&2 Drywall Contractors continued to underperform and manpower has steadily declined."

The following day, on March 22, 2017, Mahoney called Jolene Finley of Ciesco to inform her that there were "some problems between Davis and H&2" and he asked her not to ship any further materials on the joint check account. Mahoney requested a Ciesco credit application and a W-9 form. Finley and Mahoney discussed payment of Ciesco's invoices. Mahoney assured Finley that there were ample funds to pay Ciesco. Ciesco discussed internally whether it needed to take any action, such as filing a mechanic's lien or hiring legal counsel to collect the outstanding amounts due. Finley testified that Ciesco decided that it did not need to take any action, explaining that "we felt confident in the assurances we were provided by Mr. Mahoney and the Davis Company."

On March 23, 2017, Davis added Ciesco to its accounting system. Approximately two weeks later, Davis requested copies of invoices from January 2017, and Ciesco provided them the next day. Ciesco requested a status update on Davis' outstanding payments on April 10. Davis responded that a $160,670.05 payment was being processed, and that the delay was due to moving from the joint checking agreement account. Prior to replying to Ciesco's request for a status update, Davis' internal emails confirmed that the payment to Ciesco was being processed.

The owner of H&2 responded to Davis's notice to cure by stating that he could not provide the required personnel to complete the project, and that Davis should find a new subcontractor. After 72 hours had passed from the issuance of that notice, Davis terminated H&2 as a subcontractor. Davis paid H&2 a total of $969,779.70, or $299,616.30 less than what

5

the revised contract contemplated as full compensation for H&2. Davis then hired another subcontractor on March 28, 2017. Davis paid that subcontractor a total of $260,007 to complete the job. The scope of the work was the same for the new subcontractor. H&2's default caused Davis to settle claims with other suppliers.

On April 12, when Finley called again about invoices that were past due, Mahoney responded that payments in the amount of $160,670.05 were being currently processed, and he explained that "there was a slight delay with our Accounting program when we switched over from the joint check payments." On April 21, however, Mahoney called Finley to tell her that, because of the problems between H&2 and Davis, the money that Davis had planned to use to pay Ciesco's invoice had to be used instead to complete the project. What remained, Mahoney stated, was $58,000, and Mahoney offered to settle all the remaining invoices for this amount.

Davis never ordered materials directly from Ciesco. Ciesco shipped $252,062.18 in materials for which it was not paid, either by H&2, Buendia, or Davis. Davis used these materials to complete the project. Ciesco invoiced Davis for the materials, and its prices were reasonable. Mahoney agreed that if Davis had not used those supplies, it would have had to pay the new subcontractor or supplier for those materials.

Ciesco filed an amended complaint against Davis, H&2 and Buendia. Ciesco alleged breach of contract and unjust enrichment. Ciesco further sought to enforce a mechanic's and materialmen's lien. Ciesco obtained a default judgment against H&2 and Buendia. Following a bench trial, the court ruled in favor of Ciesco on its claim of unjust enrichment against Davis. The trial court further ruled that the joint check agreement was not a binding contract due to lack of consideration. Finally, the trial court found in favor of Davis on Ciesco's mechanic's lien. This appeal followed.

ANALYSIS

The doctrine of unjust enrichment effects a "contract implied in law" requiring one who accepts and receives goods, services, or money from another to make reasonable compensation for those services. *See Po River Water & Sewer Co. v. Indian Acres Club of Thornburg, Inc.*, 255 Va. 108 (1998). It arises from the simple principle that one person may not "enrich himself unjustly at the expense of another." *Rinehart v. Pirkey*, 126 Va. 346, 351 (1919). Typical examples of unjust enrichment involve a payment or overpayment under a mistake of fact, *Central Nat. Bank of Richmond v. First & Merchants Nat. Bank of Richmond*, 171 Va. 289, 311 (1938), or the acceptance of services without a contract for those services. *See Po River Water & Sewer Co.*, 255 Va. at 115 (unjust enrichment compelled payment for water and sewer services the association accepted and received).

"Unjust enrichment" is a term of art. Restatement (Third) of the Law of Restitution and Unjust Enrichment § 1, at 4 (2011). The Third Restatement rightly cautions that "[i]n reality, the law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment." *Id*. at 5. A variety of limiting principles restrict the reach of this doctrine. Several such limiting principles are at issue in this case. In particular, Davis argues that unjust enrichment is unavailable to Ciesco because: (1) the existence of a contract, the joint check agreement, forecloses relief; (2) Davis ended up paying more than the original price to complete the project and, therefore, it has not been unjustly enriched; and (3) Ciesco had no expectation of being paid by Davis and Davis had no expectation of paying Ciesco.[2]

---

[2] Davis assigns the following errors:

1. The trial court erred as a matter of law by ruling that there was no consideration for the JCA which governed the payment obligations and expectations of DAVIS, H&2 Drywall,

7

I.     THE JOINT CHECK AGREEMENT DOES NOT FORECLOSE RELIEF.

Davis' first argument in support of reversal is that the existence of a contract, the joint check agreement, bars any quasi-contractual relief. Whether the contract bars an unjust enrichment claim is an issue of law we review de novo. *CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 519 (2018). We have stated that "[t]he existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." *Id*. *See also Southern Biscuit Co. v. Lloyd*, 174 Va. 299, 311 (1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter."); Restatement (First) of Restitution § 107(1) (1937). As the commentary to a pertinent provision of the modern version of Third Restatement on Restitution and Unjust Enrichment explains,

> [c]onsiderations of both justice and efficiency require that private transfers be made pursuant to contract whenever reasonably possible, and that the parties' own definition of their respective obligations – assuming the validity of their agreement by all pertinent tests – take precedence over the obligations that the law would impose in the absence of agreement. Restitution is

and Ciesco, because the JCA gave Ciesco assurances that monies would be paid to Ciesco, and that H&2 Drywall could not abscond with monies it owed to Ciesco.

2. The trial court erred as a matter of law by ruling that DAVIS was unjustly enriched by Ciesco's delivery of drywall materials to H&2 Drywall because Ciesco had no reasonable expectation to be paid by DAVIS for the balance of monies owed by H&2 Drywall to Ciesco for those materials given Ciesco's prior written acknowledgment that DAVIS would not pay for materials except to the extent it owed money to H&2 Drywall, and the trial court determined that no monies were due from DAVIS to H&2 Drywall.

3. The trial court erred as a matter of law in determining that DAVIS was unjustly enriched by Ciesco's delivery of drywall materials to H&2 Drywall because DAVIS paid the full amount of the Subcontract for H&2 Drywall's completed scope of work, which included the drywall materials, in accordance with the express, written Subcontract.

8

> accordingly subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach.

Restatement (Third) of Restitution and Unjust Enrichment § 2, cmt. c, at 17.

At the same time, and despite its forceful embrace of the primacy of contract over remedies implied in law, the Third Restatement acknowledges as "plainly erroneous" broad statements such as "there can be no unjust enrichment in contract cases." *Id.* For example, unjust enrichment is not precluded where "a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations." *Id. See also* George E. Palmer, *The Law of Restitution* § 18.2, at 8 (1978). Sister courts have acknowledged such limitations. *See, e.g., Campbell v. Asbury Automotive, Inc.*, 381 S.W.3d 21, 35-37 (Ark. 2011) (existence of contract did not bar claim for unjust enrichment based on allegation that fees charged were illegal); *Clapp v. Goffstown Sch. Dist.*, 977 A.2d 1021, 1025 (N.H. 2009) ("Unjust enrichment may be available to contracting parties where the contract was breached, rescinded, or otherwise made invalid, or where the benefit received was outside the scope of the contract.").

Davis argues that the joint check agreement "was an express, written contract, supported by adequate consideration, that provided the terms and conditions by which Davis would pay Ciesco and H&2 Drywall by joint check for the Drywall Materials." Davis Br. at 19-20. Persuasive authority supports the conclusion that joint check agreements are supported by consideration. *See Plains Builders, Inc. v. Steel Source, Inc.*, 408 S.W.3d 596, 608 (Tex. Ct. App. 2013); *City of Phila. ex rel. Allied Roofers Supply Corp. v. Joseph S. Smith Roofing, Inc.*, 599 A.2d 222, 226 (Pa. Super. Ct. 1991). For purposes of this opinion, we will assume, without

9

deciding, that this particular joint check agreement is supported by consideration. That, however, does not end the inquiry.

By its plain terms, the joint check agreement states that its "sole purpose" "is to assist Subcontractor in making payment to Supplier of invoices on sales of all materials furnished by Supplier to Subcontractor for use in connection with the Project." It further states that "[n]othing contained in this Agreement is intended by the parties to create any contractual relationship or equitable obligation between DAVIS and Supplier." Davis seeks to stretch the plain terms of the joint check agreement far beyond its stated, and limited, purpose. Ciesco is not making any claim governed by the contract. For example, Ciesco does not contend that Davis issued checks to H&2 that were not joint checks. The expressly limited contract here does not foreclose a claim for unjust enrichment when that claim falls outside of the plain terms of the agreement.

Moreover, as Ciesco notes, the joint check agreement did not "preclude the parties from creating further or other expectations about payment through their actions and communications." Ciesco Br. at 20-21. Here, Davis and Ciesco interacted at regular intervals when the invoices were past due. Davis's involvement with Ciesco's invoices was not typical for Davis. Mahoney testified that, ordinarily, the subcontractor is hired "to manage that process, to manage the orders, [and] to manage the invoices." In this instance, Davis did not refer Ciesco to H&2 but instead responded directly to Ciesco by either paying the invoice or providing assurances that the invoice would be paid. Ciesco's policy was to stop shipping materials when its invoices had not been paid within a certain time frame. Davis's repeated direct dealings with Ciesco and the repeated

10

assurances it received from Davis, prompted Ciesco to continue shipping supplies with the

expectation that Davis would pay for those supplies.[3]

        II.        DAVIS IS NOT BEING COMPELLED TO PAY TWICE FOR THE MATERIALS.

Courts have denied unjust enrichment claims when an owner or general contractor has

previously paid for the goods or services in question. *See, e.g. Kern v. Freed Co., Inc.*, 224 Va.

678, 680 (1983) (appliance store not entitled to unjust enrichment because homeowner had paid

general contractor's fee that included the appliances).[4] An owner or contractor should not have

to pay twice for the same supplies or service. In that situation, there is no enrichment, much less

*unjust* enrichment. As the commentary to the Third Restatement of Restitution and Unjust

Enrichment indicates, there is no restitution when the defendant "has already paid the contract

price for the benefits received, even if the contract price is less than the cost or value of the

performance in question." Restatement (Third) § 25, at 371; *see also* 2 Palmer, supra, § 10.7, at

---

[3] Davis did not provide Ciesco with a copy of the subcontract between Davis and H&2. Paragraph 15 of the subcontract provided that in the event H&2 breached the subcontract, "Davis . . . may then have the work completed and may use Subcontractor's material, supplies, tools, and equipment to complete. Subcontractor and its surety shall continue to be liable for all costs to complete and any damages and expenses . . . ." Paragraph 9 of the subcontract provided that "Material paid for shall belong to [] Davis . . . ." Construing these two provisions together, it is apparent that Davis would use the supplies of a defaulting subcontractor to finish the job, and that the subcontractor would have to be liable for any damages that flowed from the default, but that Davis did not have ownership over the supplies because, according to Mahoney's testimony and as found by the trial court, Davis did not pay for them (and neither did H&2).

[4] *See also Breckenridge Mat'l Co. v. Allied Home Corp.*, 950 S.W.2d 340, 342 (Mo. Ct. App. 1997) (holding that unjust enrichment cannot exist when an owner would have to pay twice despite the subcontractor not having collected its fee); *Hydro Conduit Corp. v. Kemble*, 793 P.2d 855, 858 (N.M. 1990) (finding that unjust enrichment will not lie against a property owner who has already paid for the benefit supplied by the subcontractor); *Columbia Wholesale Co. v. Scudder May N.V.*, 440 S.E.2d 129, 131 (S.C. 1994) (denying recovery on a claim of unjust enrichment by a subcontractor against an owner where the owner paid on its contract with the general contractor).

11

424 (1978). Relying on this principle, Davis argues that it had to pay more than originally projected to finish the job, so it was not unjustly enriched.

We find this argument unpersuasive. In this instance, it is the payment for specific supplies that is at issue, not the overall cost of the project. The evidence from Davis's own project manager established that Davis did not pay anyone for the supplies Ciesco delivered to the job site and that it used those supplies. The evidence further established that, absent those materials, Davis would have had to obtain them elsewhere and pay for them. Whether the installation of those materials was done by the original subcontractor or the replacement subcontractor is similarly irrelevant to whether Davis was unjustly enriched by possessing them without paying for them. Davis is not being forced to pay twice for supplies provided by Ciesco. It is being asked to pay once.

Furthermore, the fact that Davis ultimately paid more than the original contract price to complete the project does not bar recovery. A reduction in obligations to third parties qualifies as "enrichment" in the context of unjust enrichment. Restatement (Third) § 1, at 7. It is undisputed that Davis used, and did not pay for, Ciesco's materials to complete the project. It follows that if Davis was unable to use materials it obtained from Ciesco without payment, then Davis would have needed to purchase replacement materials from another supplier, thereby increasing the total cost of the project. *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 905 (Mich. Ct. App. 2006) ("[T]he mere fact that [the subcontractor's] breach cost defendant more than originally anticipated does not undo the wrongful nature of [contractor] defendant's retention of [supplier] plaintiffs' products. We reject the argument that payment in full of the originally anticipated subcontract price [to a new subcontractor] somehow negates defendant's obligation to compensate plaintiffs for the inequitably retained materials.").

12

This case is distinguishable from *Kern*. In *Kern*, the homeowner defendant paid the general contractor an overall fee for a "turnkey" project that included the costs of the appliances. 224 Va. at 679. The homeowner also contracted with an interior designer, who ordered appliances. Both the general contractor and the interior designer left the state without paying for the appliances. *Id*. at 680. The store that provided the appliances sought to recover from the homeowner under a theory of unjust enrichment. We concluded that the homeowner was not unjustly enriched and the store could not obtain restitution against the owner. *Id.* at 681.

Persuasive authority supports our conclusion. For example, in *Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 283 P.3d 45, 49-50 (Ariz. Ct. App. 2012) the court observed that

> [t]hese cases fall into two categories: ones in which the owner has fully paid the general contractor and ones in which the owner has not fully paid the general contractor . . . [R]ecovery under a theory of unjust enrichment is not available in the former category, because the owner is not unjustly enriched if it fully paid its obligation. But when the owner has failed to fully pay its obligation, our courts have held that recovery for unjust enrichment is available because permitting the owner to retain the benefit without fully paying for it would be unjust.[5]

---

[5] Although the courts are divided on where to draw the line with claims of unjust enrichment, ample persuasive authority allows a recovery in circumstances similar to the one we face here, i.e. there is nothing "aberrant" about the conclusion we reach. *Unerstall Foundations, Inc. v. Corley*, 328 S.W.3d 305, 312-13 (Mo. Ct. App. 2010) (stating that "[p]ayment or non-payment determines whether a defendant was unjustly enriched" and upholding judgment for unjust enrichment because the evidence showed that the owner had not paid the contractor or the subcontractor for the work); *Flooring Sys., Inc. v. Radisson Grp., Inc.*, 772 P.2d 578, 581-82 (Ariz. 1989) (reversing summary judgment because hotel had not fully paid anyone, either the bankrupt general contractor or the subcontractor, for carpet installation by the subcontractor); *Eastern Metal Products, Inc. v. Deperry*, 686 A.2d 1003, 1004 (Conn. Ct. App. 1997) (evidentiary hearing needed to determine if tenant was unjustly enriched by suppliers provided to contractor, who did not pay for them); *Morris Pumps*, 729 N.W.2d at 198 ("We recognize that defendant may have paid more than the full contract price originally contemplated in the subcontract . . . . However, this does not lessen or alleviate defendant's obligation to compensate plaintiffs for the materials that were taken and used in the course of the construction project."), *Trane Co. v. Randolph Plumbing and Heating*, 722 P.2d 1325, 1329 (Wash. Ct. App. 1986) (supplier stated a claim for unjust enrichment by alleging materials were incorporated into final project but were never paid for by bankrupt contractor).

Davis is not being forced to pay twice for supplies provided by Ciesco. Consequently, this limiting principle does not bar Ciesco from seeking unjust enrichment relief against Davis.

III.    DAVIS REASONABLY EXPECTED TO PAY FOR THE SUPPLIES AND CIESCO
        REASONABLY EXPECTED TO BE PAID.

We have adopted a three-part test to govern unjust enrichment claims: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008). The first and third elements are not in dispute in this case. With respect to the first element of the test, there is no question that Ciesco conferred a benefit on Davis. *See* R. 677. Ciesco provided a significant supply of materials that Davis, by its own admission, used to finish the project. With respect to the third element, it is plain that the defendant accepted or retained the benefit without paying for its value. Davis raises a number of arguments concerning the second element.

Davis argues that it had no expectation of paying for the materials based on the joint check agreement. It cites to clause 3 of the joint check agreement, which specifies that "DAVIS will only make payments to Subcontractor and Supplier by joint check to the extent that DAVIS actually owes money to Subcontractor on the Project." Davis points out that it did not owe H&2 any money under the subcontract. Here, however, Davis repeatedly responded directly to Ciesco's inquiries about late invoices and provided assurances that Ciesco would receive payment. Davis was concerned about ensuring a continued flow of supplies. By January 2017, Davis was aware of H&2's precarious condition, notably its late payments to Ciesco and failure to pay its employees. Nevertheless, Davis directly encouraged Ciesco to continue shipping

14

supplies. In addition, Davis' internal communications and actions following termination of the subcontract and JCA are consistent with an intent on the part of Davis to pay Ciesco's outstanding invoices, initially via joint check and later directly from Davis. On March 23, Davis added Ciesco to its accounting system. By April 12, Davis internally approved and was processing a $160,670.05 payment to Ciesco, although it soon halted that payment. The factfinder could plausibly conclude that Davis expected to pay for the materials based on Davis' course of conduct with Ciesco, and that Ciesco expected to be paid for materials it was encouraged to ship. Based on these facts, we cannot say that the trial court's award on the unjust enrichment claim was "plainly wrong or without evidence to support it." *Online Res. Corp. v. Lawlor*, 285 Va. 40, 61 (2013).

This case is closely analogous to *Morris Pumps*. In that case, the general contractor continued using supplies provided by a supplier to a bankrupt subcontractor. The general contractor did not pay anyone for those supplies. 729 N.W.2d at 901-02. The Michigan Court of Appeals held that the general contractor was unjustly enriched, reasoning as follows:

> [N]either defendant nor the replacement contractor retained by defendant to finish the project ever paid plaintiffs for the materials and supplies. As the general contractor, defendant was responsible for overseeing all construction and was charged with supervising all subcontractors present on the site, including the replacement contractor retained after [the subcontractor] left the project. Moreover, as the general contractor, defendant was surely aware that the materials and supplies used to complete the project had been specially delivered to the site by plaintiffs. Defendant was also likely aware that [the subcontractor], which had gone out of business and had left the project, had not paid for the items. Regardless of whether defendant itself retained and used the materials, or merely acquiesced in the replacement contractor's retention and use of the materials, defendant was necessarily a party to the decision to use and retain the materials without paying plaintiffs.

15

> If defendant's retention of the materials supplied by plaintiffs had been completely innocent and without knowledge, we might be inclined to conclude that defendant's enrichment was not unjust. . . . . However, we simply cannot classify defendant's act of retaining and using the materials, without ever ensuring that plaintiffs were compensated for the materials, as innocent, just, or equitable.

*Id*. at 904-05.

Davis contends that we should not "allow[] any lower-tiered subcontractor or supplier to 'leap frog' up the chain of privity to recover against remote a party." Davis Br. 6. But here it is Davis that willingly climbed down the chain of privity to deal directly with a supplier in order to keep supplies flowing. Davis then used the supplies to complete the project without paying anyone for those supplies.[6]

We emphasize the limited scope of our decision. In ordinary circumstances, a supplier of labor or materials to a subcontractor will not be able to obtain a judgment against an owner or a general contractor. Moreover, where a contract actually governs the relationship of the parties, it will foreclose relief under an unjust enrichment theory. Contractors, subcontractors and suppliers remain free to structure their contracts and their conduct in such a way as to preclude claims for unjust enrichment. Here, the limited scope of the joint check agreement does not bar the unjust enrichment claim. In addition, unjust enrichment precludes an owner or a general contractor from having to pay twice for a service or supplies. That is not the situation here. Davis knew of the subcontractor's difficulties and past due invoices, and, to ensure a continued flow of supplies, interacted directly with the supplier and led the supplier to believe that payment

---

[6] Ciesco did not plead fraud. The trial court based its judgment on the theory of unjust enrichment. No part of our decision is based on a theory of fraud.

16

for those supplies would be forthcoming.  These distinct circumstances permit Ciesco to obtain

relief for Davis' unjust enrichment.

CONCLUSION

For all of these reasons, we will affirm the judgment of the trial court.

*Affirmed*.


JUSTICE KELSEY, with whom CHIEF JUSTICE LEMONS and JUSTICE CHAFIN join, dissenting.

The construction industry relies heavily upon financial and legal predictability, a public

policy highly favored by the law of contracts.  In this case, that reliance has been undermined by

an aberrant use of the doctrine of quasi-contracts.  The scenario is typical:  A supplier does not

get paid by an insolvent subcontractor, the only party that had agreed to pay the supplier, so the

supplier sues the general contractor.  The result is atypical:  A trial court orders the general

contractor to pay the subcontractor's debt to the supplier, and the majority affirms.

I respectfully dissent.

I.

The very use of the adjective "quasi" (legalese for "sort of") betrays itself as a linguistic

stretch.  A quasi-contract is not *sort of* a contract.  It is "no contract at all."  J.B. Ames, *The*

*History of Assumpsit*, 2 Harv. L. Rev. 53, 63 (1888).  No one agrees to a quasi-contract.  It is

imposed upon a party against his will.  The idea originated in the Roman civil law, migrated into

continental ecclesiastical law, and was absorbed into English equity practice.  *See generally City*

*of Norfolk v. Norfolk Cty.*, 120 Va. 356, 360-68 (1917).  English and American courts ultimately

17

incorporated the idea into the common-law "action of assumpsit." *Id.* at 361.[1] They did so with considerable caution, however, recognizing that "[i]n this class of cases, the notion of a contract is purely fictitious." *Id.* at 363 (citation omitted). And they no doubt knew, as do we, that a legal "fiction becomes wholly safe only when it is used with a complete consciousness of its falsity," L.L. Fuller, *Legal Fictions*, 25 Ill. L. Rev. 363, 370 (1930).

Generations of jurists and legal scholars have attempted to sculpt the quasi-contract concept into a workable legal doctrine. This effort has produced the cause of action generally called "unjust enrichment."[2] To be successful, an unjust-enrichment plaintiff must satisfy a threshold requirement — proving that the defendant was "enriched" at the plaintiff's "expense." *See Hamm v. Scott*, 258 Va. 35, 38-39 (1999); *Kern v. Freed Co.,* 224 Va. 678, 680-81 (1983). In the context of commercial disputes involving goods or services, one is enriched only if his economic position has been measurably improved. If a defendant's economic position is exactly

---

[1] *See also Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 213 (2002); *Baltimore & Ohio R.R. v. Burke & Herbert*, 102 Va. 643, 646-47 (1904) (quoting Lord Mansfield's opinion in *Moses v. Macferlan* (1760) 97 Eng. Rep. 676, 681; 2 Burr 1005, 1012, which states that the "gist" of a quasi-contract action in assumpsit is that the defendant "is obliged, by the ties of natural justice and equity, to refund the money"); Dan B. Dobbs & Caprice L. Roberts, Law of Remedies § 4.2(2), at 391-92 (3d ed. 2018) (explaining that restitution developed in common law through assumpsit and stating that quasi-contract cases first arose in assumpsit "sometime between around 1650 and 1700"). *See generally* Restatement (Third) of Restitution and Unjust Enrichment § 4 (2011) ("Liabilities and remedies within the law of restitution and unjust enrichment may have originated in law, in equity, or in a combination of the two.").

[2] We are not dealing here with an implied-in-fact contract, which is a true (not fictitious) contract implied from the parties' "acts and conduct" and is "created only when the typical requirements to form a contract are present, such as consideration and mutuality of assent," *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 290 Va. 36, 45 (2015) (citing *City of Norfolk*, 120 Va. at 361-62). The measure of recovery for an implied-in-fact contract is quantum meruit — the reasonable value of the services provided. *See Mongold v. Woods*, 278 Va. 196, 203 (2009); *Hendrickson v. Meredith*, 161 Va. 193, 200-02 (1933). Properly understood, quantum meruit denotes only a "measure of damages" and not an underlying theory of obligation. John L. Costello, Virginia Remedies § 12.03, at 12-10 & n.39 (4th ed. 2011).

18

the same after the plaintiff's actions as before, the expenses incurred by the plaintiff in taking such actions are irrelevant.

The plaintiff's threshold requirement, even if fully satisfied, is insufficient to justify an award of unjust enrichment. "One may not recover under a theory of implied [in law] contract simply by showing a benefit to the defendant . . . ." *Nedrich v. Jones*, 245 Va. 465, 476 (1993). An "enrichment of the defendant" does not alone "suffice since the defendant will be deprived of the enrichment only if its retention is regarded as unjust." 1 George E. Palmer, The Law of Restitution § 1.7, at 41 (1978). "Issues of considerable difficulty sometimes arise with respect to the question whether there is an enrichment, but in a much larger number of cases the problem is whether retention of a recognizable enrichment is unjust." *Id.*

To prove an *unjust* enrichment, the plaintiff must show that the defendant "knew of the benefit" and could "reasonably have expected" to pay for it. *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008). The key qualification, legal reasonableness, has well-recognized limits. As a matter of law, an enrichment cannot be unjust if the defendant has "a bona fide hostile claim of right" to whatever benefit was allegedly bestowed on him. *City of Norfolk*, 120 Va. at 374. In such a circumstance, "the law will not indulge the fiction of the existence of an implied promise of defendant to plaintiff; for that would in such case be in itself inequitable." *Id.*

In multi-party commercial transactions, a plaintiff may render a benefit to a defendant while performing a contractual obligation to a third party. The defendant, in turn, may claim a right to retain the benefit because he contracted to receive it from the third party. This scenario differs from the two-party scenarios that typically arise in the unjust-enrichment context. The usual examples are situations in which the plaintiff mistakenly confers a benefit on the wrong

person, delivers the wrong goods to the right person, or performs under a contract that is unenforceable.[3]  Those situations do not involve a third party in direct, but separate, privity relationships with both the plaintiff and the defendant.

In the third-party context, "[l]egitimate concerns about privity of contract" must be "accommodated by imposing a test of unjust enrichment that is *highly protective* of the defendant," Restatement (Third) of Restitution and Unjust Enrichment ch. 3, topic 2, intro. note (2011) (emphasis added), and by establishing "a *rigorous test* of unjust enrichment as a threshold requirement of the claim," *id.* § 25 cmt. b (emphasis added).  This protective, rigorous test focuses on whether the defendant has paid *anyone* for the benefit received and thus has a bona fide claim of right to it.  *See generally* J.R. Kemper, Annotation, *Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only with Primary Contractor to Recover Against Property Owner in Quasi Contract*, 62 A.L.R.3d 288, § 2 (1975) (collecting cases).

It is a "fundamental requirement of unjust enrichment in these circumstances . . . that [the defendant] must stand to obtain a valuable benefit at [the plaintiff's] expense *without paying anyone for it*."  Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b (emphasis added).  As a matter of law, therefore, there can be "no unjust enrichment" if the defendant has "paid the contract price" to a third party — that is, "the price originally fixed by contract for the work to which [the plaintiff] has made an uncompensated contribution."  *Id.*; *see also* Dobbs & Roberts, *supra* note 1, § 12.18(3), at 889-90; 2 Palmer, *supra*, § 10.7, at 424.

This fundamental requirement can never be satisfied, for example, where an "[o]wner can show that its aggregate payments to Builder and the other firms with which it dealt following

———————————

[3] *See* Dobbs & Roberts, *supra* note 1, § 4.1(2), at 380 (categorizing unjust-enrichment cases into common patterns).

Builder's default equal or exceed the original contract price for the work performed." Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b, illus. 1. This principle holds true "even if the contract price is less than the cost or value of the performance in question." *Id.* § 25 cmt. b. If a claimant seeks an unjust-enrichment award "for a performance that the defendant has previously agreed to pay for — the typical setting of the claim asserted by an unpaid subcontractor — the issue of unjust enrichment will be dominated, in many instances, by the question of defendant's payment." *Id.* § 25 cmt. c. "If the defendant has paid (or remains liable to pay) the agreed-on price for the benefits in question, the defendant has not been unjustly enriched." *Id.*

These requirements are not esoteric points on the edges of a debatable legal doctrine. "Cases denying restitution to an unpaid subcontractor on the ground that the [defendant] has already paid all of (or more than) the price fixed by contract for the work in question, counting payments made both to the defaulting [party] and to other parties, are *extremely numerous*." *Id.* § 25 reporter's note (emphasis added).[4] In this context, "restitution frequently is sought from the

---

[4] *See, e.g.*, *Datastaff Tech. Grp., Inc. v. Centex Constr. Co.*, 528 F. Supp. 2d 587, 598 (E.D. Va. 2007) (stating that "[w]here one is obligated by an express contract to pay for a benefit he receives, and has in fact paid, he is not liable for that benefit to another party under a theory of unjust enrichment" (citation omitted)); *Providence Elec. Co. v. Sutton Place, Inc.*, 287 A.2d 379, 382 (Conn. 1971) (finding that if the defendant "has paid its contractor . . . for those appliances, then the enrichment, in the absence of fraud, has not been unjust"); *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 390 (Fla. Dist. Ct. App. 1997) ("As we have observed, where an owner has given consideration for the subcontractor's work by paying out the contract price for the work, an unpaid subcontractor's claim that the owner has been unjustly enriched must fail."); *C. Szabo Contracting, Inc. v. Lorig Constr. Co.*, 19 N.E.3d 638, 649-50 (Ill. App. Ct. 2014) (granting payment to an unpaid sub-subcontractor when there was no evidence that the general contractor had paid the subcontractor, or anyone else, the contract price for the benefit in question); *International Paper Co. v. Futhey*, 788 S.W.2d 303, 306 (Mo. Ct. App. 1990) (finding that "[n]o unjust enrichment accrued to the [defendant] because [the general contractor] defaulted forcing them to expend additional sums in order to obtain what they were entitled to under the contract" and that "[t]he question of unjust enrichment focuses not upon what the contractor has received, but rather what the owner has paid"); *Pella Windows & Doors,*

landowner, but nearly always denied." 2 Palmer, *supra*, § 10.7, at 423. In short, absent a showing of fraud or other tortious wrongdoing, traditional unjust-enrichment principles have never required a defendant to pay a remote, non-privity plaintiff when the defendant has already paid or is legally obligated to pay a party with whom he is in privity for the same benefit.

Virginia law is entirely in agreement with this traditional understanding of unjust-enrichment principles. In *Kern v. Freed Co.*, a homeowner hired a general contractor to build a house for a fixed price. The house was to include major kitchen appliances. The homeowner also retained an interior designer to decorate the house for a fixed price. After the house had been constructed, a supplier of kitchen equipment sued the homeowner because neither the general contractor nor the interior designer had paid for the equipment supplied to the house. The supplier argued that the homeowner had received the equipment and should pay for it. The trial court agreed; we did not.

Reversing the unjust-enrichment award, we pointed out the third-party nature of the dispute. The homeowner was never in privity of contract with the supplier. *See Kern*, 224 Va. at 680. "Therefore," we concluded, the homeowner was "not liable" under contract principles to the supplier for any appliances sold to the general contractor or to the interior designer. *Id.* We

---

*Inc. v. Faraci*, 580 A.2d 732, 733 (N.H. 1990) (per curiam) (denying restitution to an unpaid window supplier when the homeowner had "spent well in excess of their originally anticipated construction costs" and thus were not unjustly enriched); *Sundance Mech. & Util. Corp. v. Atlas*, 880 P.2d 861, 866 (N.M. 1994) (denying the subcontractor's claim for unjust enrichment when the defendant had paid "a very substantial part" of the contract amount owed to the general contractor (citation omitted)); *Columbia Wholesale Co. v. Scudder May N.V.*, 440 S.E.2d 129, 131 (S.C. 1994) ("Courts addressing a claim of unjust enrichment by a subcontractor against a property owner have typically denied recovery where the owner in fact paid on its contract with the general contractor."); *Morrisville Lumber Co. v. Okcuoglu*, 531 A.2d 887, 889 (Vt. 1987) ("The retention of a benefit is not unjust where defendants have paid for it. Defendants were not unjustly enriched since defendants satisfied their obligation by paying in excess of the original contract price.").

22

then pointed out that the homeowner had paid the general contractor and the interior designer everything that they had been owed under their respective contracts — and both fixed-price contracts *included* the delivery of major appliances. *Id.* at 680-81.

On this ground alone, we held that the "quasi-contract" award of unjust enrichment was erroneous as a matter of law. *See id.* It was not enough that the supplier had not been paid and that the homeowner was benefiting from the new appliances. The supplier "should not be allowed to shift the burden of its loss" to the homeowner because the homeowner was contractually entitled to the appliances under his fixed-price contracts with the general contractor and interior designer. *Id.* at 681. In short, the homeowner "was not unjustly enriched by keeping the items in question" because he had paid the general contractor and the interior designer everything *they* were owed for providing the appliances. *Id.*

The conclusion in *Kern* should be all the more certain in construction scenarios, in which the Virginia mechanics' lien statute provides remedies to those "who, by their labor and materials, have enhanced the value of a building or structure," *United Sav. Ass'n of Tex., F.S.B. v. Jim Carpenter Co.*, 252 Va. 252, 260 (1996) (alterations and citation omitted); *see* Code § 43-3. A "historic provision of the law," *Rosser v. Cole*, 237 Va. 572, 576 (1989), the mechanics' lien statute creates "a powerful weapon for the protection of small contractors, suppliers and salaried employees," Costello, *supra* note 2, § 16.14[6], at 16-33. This weapon — a statutory lien — is "in derogation of the common law." *American Standard Homes Corp. v. Reinecke*, 245 Va. 113, 119 (1993). The inverse could be said of unjust-enrichment law if it were extended beyond its traditional boundaries. It would then become an unwitting judicial derogation of the mechanics' lien statute. *See generally* 2 Palmer, *supra*, § 10.7, at 423-24 (1978 & Supp. 2019) (collecting cases).

II.

The undisputed facts of this case fit squarely within the third-party, claim-of-right context and therefore preclude the unjust-enrichment claim as a matter of law.

A.

This case involves the typical contractual hierarchy found in the construction industry. An owner has a contract with a general contractor, who in turn has contracts with subcontractors, who in turn have contracts with suppliers. The relational riggings that hold everyone's commercial expectations together are the *actual contracts* they entered into — not the "purely fictitious" ones, *City of Norfolk*, 120 Va. at 363, that might be asserted later when the project falls apart. In such scenarios, the parties' actual contracts "convey clearly the limited kinds of liability and exposure each party has in mind." Dobbs & Roberts, *supra* note 1, § 4.8(4), at 494. It is true that "[e]ach party may benefit by the work or payments of both other parties, but the parties understand that their responsibilities and rights are only those set up by the contract." *Id.* "Respect for that contract arrangement requires the courts to refuse restitution between the parties who did not contract with each other." *Id.*

In this case, the contract between James G. Davis Construction Corporation (the "general contractor") and H&2 Drywall Contractor, LLC (the "subcontractor") established a fixed contract price of $1,194,000 in exchange for completed drywall and metal framing, among other things. *See* 1 J.A. at 310. The parties later agreed to certain change orders that increased the fixed price to $1,269,396. *Id.* The general contractor paid the fixed contract price in installments calculated on a "percent complete basis" that allowed the general contractor to "evaluate things on a 100 percent complete basis by area or by activity basis." *Id.* at 438-40. The installment payments covered "[e]verything that's required to complete [the] scope" of that

24

area or activity basis. *Id.* at 440. Nothing in this contract obligated the general contractor to calculate its installment payments to correspond to individual shipments of drywall sheets, metal wall framing, or any other itemized list of materials.

The subcontractor needed raw materials, including drywall sheets, and contracted with FTJ, Inc., formerly Ciesco, Inc., (the "supplier") for a steady supply. Pursuant to an existing credit agreement, the subcontractor agreed to pay the supplier for any materials supplied. The subcontractor's owner executed a personal guarantee to the supplier. The general contractor was not a party to either the credit agreement or to the personal guarantee.

At no point did the general contractor agree to be liable to the supplier in the event that the subcontractor failed to pay its own bills. Instead, in a form entitled "Joint Check Agreement," the general contractor stated that it would do only one very specific thing: When the general contractor issued checks to the subcontractor who was seeking payment for *the subcontractor's* services, some of those checks would include the supplier as a joint payee. *See* 2 *id.* at 704. The "sole purpose" of doing so was to "assist" the subcontractor, not the general contractor, in "making payment" to the supplier for "invoices on sales" of drywall by the supplier to the subcontractor, not to the general contractor. *Id.* Consequently, joint checks would "only" be issued "to the extent that [the general contractor] actually owes money to [s]ubcontractor on the Project." *Id.* As the supplier's accountant testified, "My understanding was that the joint checks were going to only come when there [were] payments due to [the subcontractor]." 1 *id.* at 409.

The Joint Check Agreement was poorly named as it was not much of an agreement. It stipulated that it did not create "any contractual relationship" between the general contractor and the supplier. 2 *id.* at 704. Nor did it impose any "equitable obligation" on the general contractor

25

to pay the supplier anything. *Id.* Insisting further that it did not "constitute an assignment of fund[s]," the Joint Check Agreement stated that it was "solely for the convenience of the parties" and could be "cancelled at any time" by the general contractor upon written notice. *Id.*[5]

Under the Joint Check Agreement, the subcontractor and supplier would agree among themselves what the former owed the latter for drywall delivered to the subcontractor. The general contractor would then be informed of this agreed-upon amount and would include it in the next installment check *for payment to the subcontractor* pursuant to the subcontract. The general contractor did not pay the supplier directly for anything or agree to do so. The general contractor was simply paying its subcontractor and, as an accommodation to its subcontractor's request, adding the supplier as a joint payee.

Contrary to the majority's recitation of the facts,[6] the general contractor did not directly pay the supplier for any invoices that the supplier had issued to the subcontractor.[7] The general contractor did not order supplies, count the number of drywall sheets delivered to the subcontractor, determine the timeliness of any shipments by the supplier, or approve the pricing in the supplier's invoices to the subcontractor.[8] Every check that the general contractor issued to

---

[5] The majority concludes that the Joint Check Agreement gave the supplier "a greater assurance" that "it will be paid" for its supply of drywall to the subcontractor, *see ante* at 3. In fact, however, the supplier had no assurance at all (either greater or lesser) that it would ever be paid for a single shipment under the Joint Check Agreement. The supplier's invoices became due 60 days after shipment. The Joint Check Agreement made clear that the general contractor could unilaterally cancel it at any time, before or after any shipment by the supplier to the subcontractor.

[6] *See ante* at 3, 10, 14.

[7] As described above, the general contractor issued each joint check pursuant to a Joint Check Agreement Payment Verification form executed by the subcontractor and the supplier and then submitted to the general contractor, not pursuant to any invoices. It is undisputed that every joint check followed this same process. *See* 1 J.A. at 412-13, 461.

[8] The majority implies that the general contractor managed the process, the orders, and the invoices with the supplier. *See ante* at 4. The general contractor's project manager testified

26

the subcontractor was an installment payment required *by the subcontract* between the general contractor and the subcontractor, not the revolving credit agreement between the subcontractor and the supplier. In short, the Joint Check Agreement imposed no legal or equitable obligation upon the general contractor to pay the supplier anything.

B.

When the subcontractor began to underperform on the project at some point in early 2017, the general contractor issued a notice to cure on March 21. On the next day, the general contractor warned the supplier not to deliver any more materials to the subcontractor. Hoping to nonetheless make the supplier whole, the general contractor predicted that there would be "[p]lenty of money left in [the] project" to directly pay the supplier (outside the parameters of the Joint Check Agreement) for the subcontractor's breach of the supply agreement, *see id.* at 705. That prediction turned out to be wrong.

During the next month, the general contractor began to calculate its expected losses associated with the defaulting subcontractor and concluded that the drywall project appeared to be financially underwater. On the date of the last joint check, March 1, the general contractor had responded to every payment request made pursuant to the Joint Check Agreement. *Earlier* deliveries by the supplier to the subcontractor were not overdue for payment on March 1 and, for that reason, had not been paid yet. But the supplier made no drywall deliveries after March 22 when the general contractor had notified the supplier of the subcontractor's breach. And the supplier made *no deliveries* after the general contractor's optimistic prediction that there would

_____

only that being copied on invoices was "not a typical scenario," but clarified that he did not check the invoices, manage the orders, or verify materials. *See* 1 J.A. at 474-75.

27

be sufficient project funds available to pay the supplier. It is illogical, therefore, to suggest that the supplier relied at all on the general contractor's prediction.[9]

After the general contractor had hired a replacement subcontractor to finish the drywall project, the general contractor's earlier fears of a financial loss proved to be true. The general contractor and the original subcontractor had agreed (including the initial price and the agreed-upon change orders) that the project would cost $1,269,396. *See* 1 *id.* at 310. The subcontractor defaulted after the general contractor had made $969,779.70 in installment payments to the defaulting subcontractor. *Id.* at 311-12. The stipulated damages associated with the default amounted to $41,852.20.[10] *Id.* at 313. Because the defaulting subcontractor had left the project undone, the general contractor hired a replacement subcontractor at a cost of $260,007. In the end, the general contractor lost $2,242.90 on the drywall project after having to pay the original subcontractor everything that it was owed.

C.

We must filter these undisputed facts through the third-party, claim-of-right principles governing unjust-enrichment claims. This case is not about whether the general contractor paid for each sheet of drywall delivered to the job site. The legally relevant question is whether the general contractor paid the subcontractor what the subcontractor was owed for anything (services, materials, etc.) it was supposed to provide under its fixed-price contract. The answer to that question is factually incontestable: The general contractor fully paid the defaulting

---

[9] The majority points to the supplier's testimony that they "felt confident in the assurances [they] were provided" by the general contractor during the March 22 conversation. *See ante* at 5. But this statement is irrelevant because the supplier did not rely on that assurance to deliver any materials.

[10] Though I do not think it analytically necessary, in calculating the general contractor's overpayment, I have omitted the legal expenses that the general contractor incurred as a result of the subcontractor's default. *See* 1 J.A. at 313 (payments to Peckar & Abramson).

subcontractor everything the subcontractor was owed and suffered a loss on top of that. The general contractor was left with a $2,242.90 deficit on its books because of this subcontract — a loss that it could not recover from any party. The unjust-enrichment award in this case only compounds that loss. It is equally incontestable that the supplier's materials fell within the scope of the agreed-upon contract price.[11]

In other words, the general contractor had a bona fide claim of right to the drywall.[12] The subcontractor had a contractual duty to buy the drywall, deliver it to the job site, and install it. The general contractor paid the subcontractor pursuant to a fixed-price subcontract that did not atomize the duty to pay for any one piece, stack, or truckload of drywall. In the third-party, claim-of-right context, the court cannot award unjust enrichment when the general contract has paid the contract price for the benefit it received "even if the contract price is less than the cost or value of the performance in question." Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b.

_____

[11] This is not a case in which the scope of the original contract "failed to cover significant aspects of the project," making it impossible for the court to determine whether the benefit received had been paid for in the installment payments and other payments after the subcontractor's default. *See* Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b, illus. 2.

[12] The majority seems to imply that neither the general contractor nor the subcontractor acquired title to the drywall, and their contract only permitted the general contractor to "use the supplies" even though it "did not have ownership over the supplies" because it "did not pay for them," *see ante* at 11 n.3. The only logical conclusion from the majority's implication is that title to the drywall remained with the supplier. In this heavily litigated case, the supplier has never claimed to have title or an ownership interest in any of the goods it sold to the subcontractor, which were then re-sold in a labor and materials contract to the general contractor. The supplier never made that argument because it conveyed title of the goods to the subcontractor upon delivery, *see* Code § 8.2-401(2) (adopting the Uniform Commercial Code provision that unless otherwise agreed, the title for goods passes to the buyer upon physical delivery of the goods), and the supplier had no right of repossession or self-help, *see* Code § 8.2-702(2) (articulating the limited circumstances under which a credit seller can reclaim goods). *See also* 1 Palmer, *supra*, § 4.16, at 499-500 (explaining that a credit seller cannot ordinarily reclaim goods after delivery because it has given up both title to and possession of the goods).

29

The majority comes to a different conclusion based upon a legally flawed premise and a mistaken interpretation of the factual record. The legal error stems from the majority disregarding the fact that the general contractor "had to pay more than originally projected to finish the job," *ante* at 12. This very assertion misconstrues the general contractor's argument. The general contractor focuses its argument on the cost to finish the scope of work *in the subcontract* — not the overall costs, projected or ultimately incurred, "to finish the job," *ante* at 12. Regardless, the majority reasons that none of this matters because "it is the payment for specific supplies that is at issue, not the overall cost of the project." *Ante* at 12. That is akin to saying that the defendant was unjustly enriched because he ended up a little less impoverished. Such a view cannot possibly survive the "highly protective" legal standard applicable to restitution awards in the third-party, claim-of-right context, Restatement (Third) of Restitution and Unjust Enrichment ch. 3, topic 2, intro. note, which insists on "a rigorous test" as a threshold requirement for the imposition of unjust-enrichment liability, *id.* § 25 cmt. b.

Taking an aberrant view of this issue, the majority adopts the reasoning of an intermediate state court, *see ante* at 15-16, that is both internally inconsistent and in opposition to the Restatement.[13] In *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 905 (2006), the

_____

[13] In an effort to demonstrate that its position is not aberrant, the majority cites to cases that apparently allow "recovery in circumstances similar to the one we face here," *see ante* at 13 n.5. In *Flooring Systems, Inc. v. Radisson Group, Inc.*, 772 P.2d 578, 581 (Ariz. 1989) (en banc), the court reversed a summary judgment ruling against a subcontractor and remanded the case for an evidentiary hearing, noting that the owner had not paid the full contract price owed to the general contractor. In *Eastern Metal Products, Inc. v. Deperry*, 686 A.2d 1003, 1004 (Conn. App. Ct. 1997), the court reversed the trial court's dismissal and remanded the case for an evidentiary hearing because the trial court had erroneously held that a tenant, unlike a landowner, could never be unjustly enriched by a general contractor's work. In *Trane Co. v. Randolph Plumbing & Heating*, 722 P.2d 1325, 1328-29 (Wash. Ct. App. 1986), the court held that a general contractor was unjustly enriched when the defaulting subcontractor's surety paid the general contractor to furnish and install six fans, and the general contractor did not pay the supplier for the fans it had delivered. Not only are these cases factually dissimilar in significant

Michigan Court of Appeals found that although the general contractor "may have paid more than the full contract price originally contemplated in the subcontract," it was still obligated to compensate the supplier for the materials delivered to the job site. This view is opposed not only by the Restatement,[14] but also by the "extremely numerous" cases that turn on whether the defendant paid the contract price under a contract that included the benefit at issue, *see* Restatement (Third) of Restitution and Unjust Enrichment § 25 reporter's note; *supra* note 4 and accompanying text. The question of whether the general contractor paid for the supplies should be answered by whether the general contractor paid the contract price for the scope of work encompassing those supplies.

The majority also mistakenly implies that the general contractor, after the original subcontractor's default, simply lucked into some free stacks of uninstalled drywall that were turned over to the replacement subcontractor in return for a dollar-for-dollar reduction in the cost of picking up where the defaulting subcontractor had left off — thus, no harm, no foul. *See ante* at 12. The supplier, however, has never made this factual assertion either at trial or on appeal, and the record does not support it.

All we know is that the supplier did not deliver drywall to the job site after the general contractor had fired the defaulting subcontractor. No witness or exhibit at trial suggested (much less proved) that there had been stacks of drywall lying around on the job site ready for the replacement subcontractor to use. Nor did the supplier attempt to establish how much of the

---

ways, but they do not support the majority's conclusion that a general contractor can be unjustly enriched even when it has paid the full contract price for the benefit it received.

[14] *See* Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b ("There is accordingly no unjust enrichment if [the defendant] has paid the contract price to [the third party]; nor if [the defendant] has paid in full (to [the third party] and to others, following [the third party's] default) the price originally fixed by contract for the work to which [the plaintiff] has made an uncompensated contribution.").

drywall the subcontractor had already installed or left uninstalled prior to permanently leaving the job site. Despite having the burden of proof, the supplier offered no evidence on any of these factually dispositive points. The majority responds to this failure-of-proof point by summarily dismissing it as legally "irrelevant," *see ante* at 12. Under traditional principles of unjust enrichment, I do not see how that could be true.

III.

Having failed to establish a quasi-contract claim, the majority adds to it a quasi-fraud claim — as if two half theories of liability make a whole.

The majority emphasizes the general contractor's conduct in dealing with the supplier, alleging that it directly paid the supplier's invoices and communicated "repeated assurances" of payment. *See ante* at 10-11, 14, 16. The general contractor did this "to ensure a continued flow of supplies." *Ante* at 16. Although the general contractor was aware of the subcontractor's "precarious" financial position, it "*directly* encouraged [the supplier] to continue shipping supplies." *Ante* at 14 (emphasis added). These facts prove, the majority concludes, that the general contractor misleadingly "led the supplier to believe that payment for those supplies would be forthcoming." *Ante* at 16.

This narrative comes quite close to accusing the general contractor of representing "as true what [was] really false, in such a way as to induce a reasonable person to believe it, with the intent that the person [would] act upon this representation," *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994), which is one of the definitions of common-law fraud. The supplier, however, did not allege, prove, or even mention fraud of any kind. "Under Virginia law, 'fraud, whether actual or constructive, is never presumed and must be strictly proved as alleged.'" *Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 381 (2018) (alteration and

citation omitted).  Litigants must plead fraud with particularity and prove it by clear and convincing evidence, a burden of proof "higher than a mere preponderance," *id.* at 382.  "The charge must be direct as the proof must be clear."  *Id.* (citation omitted).  Virginia law does not recognize claims of quasi-fraud.[15]

What is more, the majority's enticement theory relies upon two unsupportable factual assertions:  (i) that the general contractor, breaking from industry custom, communicated directly with the supplier and directly paid the supplier's invoices, and (ii) that the general contractor knew of the subcontractor's inevitable default while enticing the supplier to continue shipments with false promises of future payments.  The evidence supports neither of these assertions.

As to the first assertion, the general contractor did not directly pay the supplier's invoices, *see supra* note 7 and accompanying text, but consistently followed the standard process of issuing joint checks in response to payment-verification forms executed by the subcontractor and supplier, *see* 1 J.A. at 461, which the supplier agreed "was the process that was followed for all of the joint checks on this project," *see id.* at 412-13.  The communications between the general contractor and the supplier merely discussed the status of the joint checks pursuant to the payment-verification forms.

As to the second assertion, no evidence proves that the general contractor knew the subcontractor would default (or be unable to pay suppliers) prior to sending the notice to cure on March 21.  The evidence demonstrates only that the general contractor knew that the subcontractor had been having manpower issues at some unidentified point "early in 2017," *see id.* at 465, sent the notice to cure on March 21, *id.* at 310, and knew on March 22 that the

---

[15] I say "quasi-fraud" because the majority expressly disclaims any effort to say the general contractor committed actual fraud, *see ante* at 16 n.6.

33

subcontractor would not be able to pay its suppliers, *id.* at 467. The general contractor made no promises, express or implied, that it would guarantee payment to the supplier if the subcontractor defaulted.

The majority repeatedly claims that the general contractor gave "assurances" of payment to the supplier. *See ante* at 4, 5, 10, 11, 14. The implication is that the general contractor's communication regarding joint checks morphed into some kind of false assurance to the supplier of *future* payment for the *continued* delivery of supplies. The evidence the majority relies upon, however, is wholly insufficient to support this implication.[16] Not one conversation between the general contractor and supplier suggested an assurance of payment for a future delivery of supplies.

The evidence in this case cannot support a viable fraud claim, even if one had been pleaded, and should not be used to support a quasi-fraud claim, even if one existed legally. I thus reject the enticement-by-false-assurances narrative that is just below the surface of the majority's reasoning.

IV.

In sum, the trial court erred as a matter of law by awarding unjust enrichment to a supplier that had not been paid by its customer, a defaulting subcontractor, in a case in which the

---

[16] The majority mentions three specific communications from November 2016, December 2016, and January 2017. *Ante* at 3. In November 2016, the general contractor replied to a question from the supplier regarding the status of its joint check by confirming the submitted payment-verification forms and providing the issue date for the next set of checks. *See* 2 J.A. at 706-09. In December 2016, the supplier asked about the status of the recently submitted payment-verification form, and the general contractor replied that the joint check had already been issued. *See* R. at 1534-35. In January 2017, the general contractor told the supplier that it would be able to issue the joint check for the October (now past due) and November payment-verification forms by the end of January, *see* 2 J.A. at 710, which it did. The subcontractor was routinely copied in these conversations. *See id.* at 706-07, 710-11; R. at 1533-35.

34

general contractor had paid the defaulting subcontractor everything the subcontractor had been owed and still suffered a loss.

I respectfully dissent.